IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 3:19-CR-219-TAV-HBG |
| ) | |
| JAVASTON D. BADGETT, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate.

This matter is before the Court upon Defendant Badgett's Motion to Suppress Evidence and Statements [Doc. 23], filed on December 21, 2020.[1] The Government responded in opposition on January 29, 2021. [Doc. 29]. An evidentiary hearing was held on Defendant's motion on April 13, 2021. [Doc. 32]. Assistant United States Attorney Alan Kirk appeared on behalf of the Government. Attorney Christopher Rodgers appeared on behalf of Defendant, who was also present. After hearing the arguments of counsel, the Court took the motion under advisement.

Accordingly, after reviewing the parties' briefs and arguments, the evidence and exhibits presented at the hearing, and the relevant legal authorities, the Court recommends that the Defendant's Motion to Suppress [Doc. 23] be denied.

---

[1] Attorney Christopher Rodgers was appointed as substitute counsel in this case on October 27, 2020. [Doc. 22]. After the filing of the motion to suppress, the Court ordered Defendant to file a brief showing cause for the untimely filing of the suppression motion. [Doc. 25]. Ultimately, the Court granted Defendant's request for a hearing on the suppression motion and directed the Government to file a response. [Doc. 28].

I.      POSITIONS OF THE PARTIES

This case arises out of the August 22, 2019 traffic stop of Defendant's silver 2011 Kia Optima ("silver Kia") by Knox County Sheriff's Office Detective John Sharp ("Detective Sharp") in the parking lot of an Advanced Auto Parts store on the north side of Asheville Highway.

Defendant is charged [Doc. 1] with possession with intent to distribute methamphetamine (Count One); brandishing a firearm in the furtherance of a drug trafficking crime (Count Two); and being a felon in possession of a firearm (Count Three).

Defendant seeks [Doc. 23] to suppress and exclude all evidence and statements made as a result of the traffic stop of his vehicle on August 22, 2019. Defendant asserts that in his incident report, Detective Sharp "does not articulate any traffic violations to warrant a stop on the vehicle other than asserting that he recognized Mr. Badgett and had prior knowledge of an alleged suspended license with no other facts." [*Id.* at 2]. Defendant claims that Detective Sharp's knowledge of his prior criminal record and current bond condition does not suffice as reasonable suspicion or probable cause to initiate a traffic stop. Therefore, Defendant asserts that Detective Sharp's alleged knowledge of Defendant's suspended driver's license "with no articulation as to the source of the knowledge or recency" does not justify the traffic stop. [*Id.*].

The Government responds [Doc. 29] that Detective Sharp observed Defendant sitting in the driver's seat of the silver Kia in the parking lot of a Breadbox convenience store, that he recognized the Defendant, and had prior knowledge of his criminal history and suspended driver's license. The Government states that Detective Sharp queried law enforcement databases and confirmed that Defendant had a suspended driver's license. Therefore, the Government asserts that the subsequent traffic stop was based upon the probable cause that Defendant was operating a motor vehicle while having a suspended driver's license—in violation of Tenn. Code Ann. § 55-

2

50-504.  Lastly, the Government claims that Detective Sharp's knowledge of Defendant's driver's license status was not stale at the time of the traffic stop.

**II.     SUMMARY OF TESTIMONY**

At the April 13 hearing, the Government presented the testimony of Detective Sharp and Knox County Sheriff's Office Deputy Tyler Ballard.  Additionally, the Government introduced several exhibits.  The Court summarizes the witnesses' testimony and exhibits as follows.

The Government first presented the testimony of Detective Sharp, who testified that he has been employed by the Knox County Sheriff's Office since January of 2007 in a variety of positions and is currently assigned to the Narcotics Unit.  Detective Sharp described his duties in conducting undercover narcotics investigations.  Next, Detective Sharp testified that he was familiar with the Defendant and identified him in the courtroom.  Detective Sharp detailed that a couple of days before the traffic stop, he was told by an informant that Defendant was distributing methamphetamine in the East Knoxville area, locations where Defendant frequented, and that he drove a silver Kia.  Detective Sharp stated that he started a background investigation and learned of a previous arrest from the City of Knoxville Police Department.  Detective Sharp testified that he verified the tag number and driver's license of the vehicle, pulled up Defendant's picture, and searched public records for other addresses and people that Defendant was associated with. Further, Detective Sharp detailed that he learned the status of Defendant's driver's license—that it was suspended for a failure to file insurance on the vehicle.  Detective Sharp also stated that he confirmed the registration of the vehicle.

On follow-up questioning, Detective Sharp stated that he pulled up the City of Knoxville Police Department reports, and that Defendant was recently arrested for Schedule II narcotics offenses, as well as under the Criminal Justice Portal from the State of Tennessee, he had two prior

3

convictions for the sale of Schedule II narcotics.  Detective Sharp conducted searches through the statewide THOR database and found several reports from the City of Knoxville which identified Defendant and the vehicle in previous arrests for Schedule II narcotics sales.  Detective Sharp described the process, stating that he can conduct a desk investigation through several forms of technology to review these databases.  When asked about the silver Kia, Detective Sharp stated that the informant identified the vehicle make and model that Defendant was driving.  Further, Detective Sharp stated that in reviewing the reports, he found a vehicle that matched the description provided by the informant.  Detective Sharp then ran the license plate number from the reports, which came back to an associate of Defendant.  Additionally, Detective Sharp stated that law enforcement can check the status of an individual's driver's license through both the Tennessee Criminal Justice Portal and NCIC, and that he checked both of these to learn that Defendant's driver's license was suspended.

      The Government then introduced Exhibit 1E, which was a screenshot of the Criminal Justice Portal driver's license record for Defendant.  Detective Sharp testified that this screenshot was the portal information for Defendant, and that he queried this database multiple times in the days prior to Defendant's arrest, including the day before.  Detective Sharp stated that he learned that Defendant's driver's license was suspended.  Additionally, Detective Sharp testified that driving on a suspended license is an arrestable offense in Tennessee.

      When asked about August 22, 2019, Detective Sharp stated that he was conducting other investigations when an informant contacted him and said that Defendant was in the Asheville Highway area near a gas station and a laundromat, and that Defendant would have methamphetamine on him.  Detective Sharp testified that he, along with several other officers, saturated the area looking for Defendant's vehicle for a couple of hours.  Detective Sharp detailed

4

that around 6:15 p.m. another law enforcement officer, Sergeant Ferrell, radioed that he saw a silver Kia traveling east on Asheville Highway over the river. Detective Sharp testified that Sergeant Ferrell informed him that the vehicle turned into the Breadbox gas station at the corner of John Sevier Highway and Asheville Highway. Detective Sharp then left the shopping complex he was at, and as he went to turn right to head west on Asheville Highway, Defendant's vehicle was perpendicular preparing to turn onto Asheville Highway. The Government then introduced an aerial screenshot of the area as Exhibit 2, which Detective Sharp identified as the location where the incident took place.

Detective Sharp stated that he was parked in between the Advance Auto Parts and Auto Zone on Holston Ferry Road, and as he turned down the road onto Asheville Highway, Defendant was leaving the gas station and preparing to exit onto Asheville Highway. Detective Sharp turned to head west on Asheville Highway, and while looking across the median, saw the silver Kia with Defendant in the driver's seat. Detective Sharp testified that he was able to recognize Defendant, as he had previously looked at several pictures, including on Defendant's social media account and previous booking pictures. Detective Sharp stated that the front window of Defendant's vehicle was clear enough to recognize him, while the side windows had a "pretty good" amount of tint. Detective Sharp testified that he was able to recognize Defendant from the front window.

Detective Sharp then passed by heading west, as Defendant was getting ready to pull out of the gas station. Detective Sharp stated that he was driving a blacked out, silver Dodge Charger. The Dodge Charger was not a marked patrol vehicle, but Detective Sharp testified that he believed it was obvious that it was a police vehicle due to the known status of vehicle make and model. Detective Sharp stated that the vehicle had 360 degree emergency lighting, with blue LED lights on the bottom of each side, a blue light in the back passenger window, lights in the grill and top of

5

the windshield, and a light bar in the back—in addition to the tool in the vehicle causing the lights to flash.

Next, Detective Sharp went to take a U-turn to head east on Asheville Highway to attempt to get behind Defendant after he pulled out onto the road. However, Defendant then made a U-turn, and as Defendant made the U-turn, Detective Sharp followed him and activated his emergency lights to get traffic to stop. As Defendant turned into Holston Ferry Road, Detective Sharp testified that Defendant accelerated, and he believed that Defendant knew that a police vehicle was behind him. Defendant then turned into the Advanced Auto Parts store, accelerated through the parking lot, and stopped the vehicle upon coming up to an embankment at the end of the parking lot. Detective Sharp stated that he was between a car length and one and a half car lengths from Defendant's vehicle when making the turn, that Defendant gained some ground when turning into the Advanced Auto Parts store, and that his (Detective Sharp's) emergency lights remained on in the vehicle. Detective Sharp testified that he was anticipating that Defendant was going to run based upon his experience, the way the vehicle stopped, and the door starting to open before the vehicle stopped.

At this point, Defendant's vehicle stopped, and both Defendant and Detective Sharp started to exit their vehicles. Detective Sharp testified that as Defendant exited his vehicle, he saw that Defendant turned towards him and had a firearm in his hands. As Defendant raised the handgun, he fumbled it and dropped the handgun. Detective Sharp stated that there were cars, including a semi-truck behind Defendant, so Detective Sharp waited to fire his weapon. Detective Sharp testified that Defendant had both hands gripping the firearm, he raised the firearm around waist high with the barrel facing Detective Sharp, and Defendant then dropped the firearm to the ground. Detective Sharp told Defendant to stop, but Defendant then grabbed the weapon and ran away.

Detective Sharp stated that he radioed that Defendant was running on foot with a weapon, and Defendant and Detective Sharp ran around the Advanced Auto Parts building, continued north past the building, and that there was an embankment right before entering Riverview Crossing Drive that runs around the north side of the Advance Auto Parts store. Here, Detective Sharp testified that Defendant continued across Riverview Crossing Drive, where Sergeant Ferrell came up to Defendant in his vehicle. Defendant continued and tripped and fell on the ground, and Detective Sharp stated that he saw Defendant throw a package under a parked vehicle.

Detective Sharp further testified that Defendant then ran into the parking lot of the old Food City store, at which point several members of law enforcement had circled into the parking lot. After being challenged, Defendant put the weapon on the ground but did not comply with the directions that he was given by the other law enforcement officers. Detective Sharp stated that the other law enforcement officers tackled Defendant after he failed to comply with their directions, and after a short struggle, Defendant was placed in handcuffs. Detective Sharp detailed that four other law enforcement officers (Sergeant Ferrell, Detective Ballard, Officer Pickett, and Officer Shuford) were present during the pursuit and apprehension of Defendant. The Government then introduced as Exhibit Four a picture of the markings that Detective Sharp had made on the aerial overview (Exhibit 2). Detective Sharp stated that he, along with other members of law enforcement (Sergeant Ferrell, Detective Pickett, and Detective Shuford), wrote reports after the arrest, and the Government introduced as exhibits Detective Sharp's report (Exhibit 1A), Sergeant Ferrell's report (Exhibit 1B), Detective Pickett's report (Exhibit 1C), and Detective Shuford's report (Exhibit 1D).

The Government introduced a series of several photographs (Exhibit 3A–L) of the scene of the traffic stop and arrest on August 22, 2019. Detective Sharp identified Exhibit 3A as a picture

of the Advanced Auto Parts parking lot; Exhibit 3B as the vehicle Defendant was driving and its license plate number, as well as where Defendant parked; Exhibit 3C displaying how the silver Kia was left with the driver's side door open; Exhibit 3D as the side of the Advanced Auto Parts store where Defendant ran along the outside of the building; Exhibit 3E as the small embankment where Defendant tripped and the path he took; Exhibit 3F as where Defendant tripped and fell to the ground, the hat that he lost, and the parked vehicle where law enforcement saw him throw a plastic baggie; Exhibit 3G as the plastic baggie of methamphetamine found under the vehicle; Exhibit 3H as where Defendant was taken into custody, with Defendant in the picture in the orange shirt with white lettering; Exhibit 3I as the handgun that Defendant had; Exhibit 3J as a close-up picture of the handgun; Exhibit 3K as the amount of currency that was recovered; and Exhibit 3L as the methamphetamine recovered from under the vehicle.

On cross-examination, Detective Sharp stated that he was looking for Defendant and the silver Kia on August 22nd based on information received from the confidential informant. Detective Sharp testified that he did not recall whether the informant had purchased narcotics from Defendant in the past, but that they knew that he was selling methamphetamine. Detective Sharp testified that there was not an attempt to set up a controlled purchase from Defendant. Additionally, Detective Sharp testified that the informant had been utilized for a significant amount of time and had been reliable in everything they provided. Detective Sharp stated that the silver Kia was not registered to Defendant and that the side windows had a dark tint. Detective Sharp testified that he was driving pretty slow when he first observed the silver Kia and that the road was clear. However, Detective Sharp stated that he had not previously had any contact with Defendant and that his identification was based on photographs of Defendant.

8

Detective Sharp stated that he was already in the general area when Sergeant Ferrell informed him that silver Kia had driven into the Breadbox parking lot. Detective Sharp testified that at this point, no moving violations had occurred. Then, Detective Sharp stated that he recognized Defendant through the front-seat of the silver Kia, and that when he initiated the traffic stop, it was based on his knowledge that Defendant had a suspended license, along with potential window tint violations. However, Detective Sharp provided that the main basis of the stop was his prior knowledge of Defendant's suspended license. Detective Sharp testified that the databases are updated very quickly, and that in his experience, a database has not stated that a license was suspended when it in fact was not. Additionally, Detective Sharp stated that at the time he initiated his blue lights, there had been no moving violations—other than the knowledge that Defendant's driver's license was suspended in connection with the equipment violations.

Next, Detective Sharp testified that after the foot pursuit, he and Sergeant Ferrell both saw Defendant throw the plastic baggie under the parked vehicle. Detective Sharp testified that he was not aware who specifically the silver Kia was registered to at this time, and that he did not recall what that individual looked like. Detective Sharp detailed that in the investigation, he ran "associates analytics," which identified associates of Defendant, and that the vehicle was registered to one of the listed associates. Detective Sharp stated that these files are public record. Additionally, Detective Sharp testified that no one else was in the vehicle with Defendant.

On redirect examination, Detective Sharp stated that he was driving slowly right before he recognized Defendant, approximately fifteen to twenty miles per hour. Detective Sharp estimated the distance between him and Defendant's vehicle as two lanes of traffic and a shoulder—approximately forty feet. Detective Sharp stated that he referred to the confidential informant under both genders to protect the identity of the informant. On recross examination, Detective

9

Sharp testified that the silver Kia was facing north upon pulling out of the Breadbox, and that the weather was clear, but that he did not remember any glare on the windshield.

The Government then presented the testimony of Deputy Tyler Ballard. Deputy Ballard stated that he is currently employed by the Knox County Sheriff's Office, that he has been employed there since January 2015, and that he has been stationed with the Narcotics Unit for four years as a detective investigating narcotics trafficking. Deputy Ballard testified that he recognized Defendant, and on August 22, 2019, he arrived at the area of Asheville Highway shortly after Detective Sharp. Deputy Ballard stated that shortly after he arrived, Detective Sharp tried to initiate the traffic stop of the silver Kia. At this point, Deputy Ballard stated that once Defendant began running, he went to a road between the auto parts store and the vacant parking lot. While reviewing Exhibit 2, Deputy Ballard identified it as Riverview Crossing Drive. Deputy Ballad stated that he was in an unmarked vehicle and that he went onto Riverview Crossing Drive to attempt to cut off Defendant. Deputy Ballard saw Defendant attempt to cross the road, fall twice, and he then pursued Defendant on foot into the vacant parking lot. Deputy Ballard stated that he observed Defendant fall in the grassy area north of Riverview Crossing Drive, and once they got into the parking lot, he could observe that Defendant had a gun in his hand.

Once in the parking lot, Deputy Ballard testified that he chased Defendant on foot for a short distance, until Defendant got to the back of pick-up truck. Deputy Ballard then identified the pick-up truck from Exhibit 3H. At this point, Deputy Ballard had his weapon drawn and continued to give commands for Defendant to stop running. Deputy Ballard testified that Defendant kept looking back at him, and Defendant never raised his gun above his knee. Deputy Ballard stated that once Defendant reached the back of the truck, Defendant turned and faced him (Deputy Ballard), and that he could not see Defendant's hands. Deputy Ballard testified that he

10

told Defendant again to drop the gun, that Defendant dropped the gun, and that he was taken into custody after being forcibly placed into the ground.

When questioned about the firearm, Deputy Ballard stated that after Defendant was arrested, he stood over the gun so no one would interfere with the piece of evidence. Deputy Ballard identified the firearm after reviewing Exhibit 3I as the one that Defendant possessed, as well as testified that the firearm was not touched until it was secured by law enforcement. After the scene was secured, the forensic officer took possession of the firearm.

### III. FACTUAL FINDINGS

The following factual findings are taken from the testimony and exhibits presented at the suppression hearing.

In August 2019, Detective Sharp and the Knox County Sheriff's Office received information from a confidential informant that Defendant was distributing methamphetamine and that he drove a silver Kia Optima. Detective Sharp searched law enforcement databases and learned that the silver Kia was registered to an associate of Defendant, as well as that Defendant's driver's license was suspended for the failure to provide proof of vehicle insurance.

On August 22, 2019, a confidential informant contacted Defendant Sharp and instructed him that Defendant was in the Asheville Highway area and was in the possession of methamphetamine. Between 6:00 and 7:00 p.m., another member of law enforcement located the silver Kia, and Detective Sharp witnessed the silver Kia in the parking lot of the Breadbox convenience store preparing to turn onto Asheville Highway. Detective Sharp was heading west on Asheville Highway and identified Defendant driving the silver Kia, preparing to turn right out of the gas station east onto Asheville Highway. Detective Sharp made a U-turn to get behind

11

Defendant, however, Defendant then also made a U-turn. Detective Sharp followed Defendant and activated his emergency lights and prepared to effectuate a traffic stop.

Defendant then turned into the parking lot of an Advanced Auto Parts store on the north side of Asheville Highway, drove through until the end of the parking lot, and exited the vehicle. Defendant had a firearm in his hand as he left his vehicle, failed to comply with Detective Sharp's instructions, and fled the scene of the traffic stop on foot. During a brief chase, law enforcement witnessed Defendant throw a large plastic baggie under a nearby vehicle, which contained approximately 1.2 ounces of what was believed to be methamphetamine. Defendant was eventually detained and arrested by law enforcement in a parking lot after crossing Riverview Crossing Drive.

## IV.     ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. Defendant challenges the initial stop of his silver Kia on August 22, 2019, claiming that law enforcement did not have sufficient justification to stop the vehicle.

A traffic stop qualifies as a "seizure" for purposes of the Fourth Amendment. *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)); *see also United States v. Guajardo*, 388 F. App'x 483, 487 (6th Cir. 2010) ("The Fourth Amendment's prohibition against unreasonable searches and seizures by the government 'extend[s] to brief investigatory stops of persons or vehicles that fall short of traditional arrest.'") (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). In *United States v. Simpson*, the Sixth Circuit held that based on its prior decision in *United States v. Freeman*, 209 F.3d 464 (6th Cir. 2000), law enforcement must have probable cause to initiate a traffic stop for a completed misdemeanor, such as veering into an emergency lane, but only reasonable suspicion for a traffic

12

stop for an ongoing misdemeanor, such as driving on a suspended license. 520 F.3d 531, 541 (6th Cir. 2008); *see, e.g.*, *United States v. Sandridge*, 385 F.3d 1032, 1036 (6th Cir. 2004); *United States v. Shelton*, No. 2:18-056-JTF-DKV, 2019 WL 3417369, at *2 (W.D. Tenn. Apr. 1, 2019), *report and recommendation adopted by*, 2019 WL 2563821 (W.D. Tenn. June 21, 2019), *aff'd*, 817 F. App'x 217 (6th Cir. 2020); *United States v. Henderson*, No. 2:16-20054-JTF-DKV, 2016 WL 11257355, at *3 (W.D. Tenn. Dec. 8, 2016), *report and recommendation adopted by*, 2017 WL 680443 (W.D. Tenn. Feb. 21, 2017).

"Thus, if at the time of the stop the officer had a reasonable suspicion that the target was violating a traffic law or ordinance, 'then it simply does not matter whether [the officer] intended to stop [the defendant] on the basis of that traffic violation' or instead intended to stop the defendant because he suspected criminal activity was afoot." *Shelton*, 2019 WL 3417369 at *2 (quoting *United States v. Hughes*, 606 F.3d 311, 316 (6th Cir. 2010)). In *Hughes*, the Sixth Circuit stated that:

> [I]n order for [a] traffic stop to be permissible under the Fourth Amendment, a police officer must know or reasonably believe that the driver of the car is doing something that represents a violation of law. This is not to say that officers must be able to, at the time of the stop, cite chapter and verse – or title and section – of a particular statute or municipal code in order to render the stop permissible. This rule might be better stated as saying that police officers may not look for after-the-fact justifications for stops that would otherwise be impermissible; following a stop, the government should not begin poring through state and local traffic ordinances looking for any that a suspect might have violated.

606 F.3d at 316. Reasonable suspicion exists when the investigating officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). "Reasonable suspicion requires more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard." *United*

13

Case 3:19-cr-00219-TAV-JEM Document 34 Filed 07/09/21 Page 13 of 18
PageID #: 84

*States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012) (citations omitted). Whether an officer's suspicions are reasonable is assessed in the totality of the relevant circumstances. *United States v. Cortez*, 449 U.S. 411, 417–18 (1981). On the other hand, "the requirements of probable cause are satisfied where 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *United States v. Davis*, 430 F.3d 345, 352 (6th Cir. 2005) (citations omitted).

Ultimately, the Court finds that at the time of the August 22, 2019 traffic stop, Detective Sharp had a reasonable suspicion of an ongoing misdemeanor—that Defendant was operating a motor vehicle with a suspended license in violation of Tenn. Code Ann. § 55-50-504.[2] The Court finds Detective Sharp's testimony credible that he investigated Defendant upon receipt of the tip from the confidential informant that Defendant drove the silver Kia, distributed methamphetamine, and would be in a certain area near Asheville Highway with methamphetamine; that a database search revealed that Defendant's driver's license was suspended; that law enforcement located the silver Kia in the vicinity of the area identified by the confidential informant; and that Detective Sharp identified Defendant through the front window of the vehicle after previously observing several photographs of Defendant.

---

[2] While not required, the Court also finds that Detective Sharp had probable cause to believe that Defendant was operating a motor vehicle without a valid driver's license due to the short time period between when he checked the applicable databases and witnessed Defendant driving the silver Kia. Detective Sharp had probable cause to believe that Defendant was driving on a suspended license, as he had determined the day prior that Defendant's driver's license was suspended and no credible evidence was presented at the hearing that contested his testimony. *See, e.g.*, *United States v. Alexander*, No. 2:18-CR-34, 2018 WL 7283315, at *4 (E.D. Tenn. Dec. 21, 2018) (finding law enforcement had probable cause to conduct a traffic stop due to the defendant driving on a suspended license where "Detective Shockley testified he knew Alexander did not have a valid driver's license and his operation of the vehicle was against the law."), *report and recommendation adopted by*, 2019 WL 287326 (E.D. Tenn. Jan. 22, 2019), *aff'd on other grounds*, 954 F.3d 910 (6th Cir. 2020).

The Supreme Court has recognized that states have a "vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles [and] that licensing, registration, and vehicle inspection requirements are being observed." *Delaware v. Prouse*, 440 U.S. 648, 658, (1979); *see, e.g.*, *Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020). In *Glover*, the Supreme Court recently found that an investigative traffic stop conducted after law enforcement ran a vehicle's license plate and learned that the registered owner has a revoked driver's license is reasonable under the Fourth Amendment when "the officer lacks information negating an inference that the owner is the driver of the vehicle." *Id.* at 1186.

While Defendant was not the registered owner of the vehicle in the present case, the confidential informant told Detective Sharp that Defendant drove the silver Kia. Several days before the traffic stop, as well as the immediate day prior, Detective Sharp learned that Defendant's driver's license was suspended, had driven the silver Kia, and that the silver Kia was registered to an associate of Defendant. This individual was listed as one of Defendant's associates on public records databases. Further, on the date of the traffic stop, Detective Sharp received information that Defendant was in the Asheville Highway area, and law enforcement located a silver Kia in the same area. Therefore, Detective Sharp corroborated the vehicle's make and model, as well as location, with the information received by the confidential informant. Defendant has further failed to present sufficient evidence to discredit Detective Sharp's testimony that he was able to identify Defendant through the clear, front window of the silver Kia. Additionally, Detective Sharp stated that he had reviewed several photographs of Defendant, including booking records and social media photographs, in the days leading up to the traffic stop. Therefore, the Court finds that Detective Sharp had a reasonable suspicion that Defendant was operating the silver Kia with a suspended driver's license and properly attempted to stop the vehicle.

Defendant challenges Detective Sharp's justifications for the traffic stop of the vehicle, claiming that law enforcement was investigating Defendant based upon the tip received from the confidential informant regarding the distribution of methamphetamine, and therefore the stop of the silver Kia was pretextual.

However, "so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993); *see, e.g.*, *␣hren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *United States v. Mans,* 999 F.2d 966, 968 (6th Cir. 1993) (holding that an officer's stop of a defendant was reasonable, and not pretextual, where the officer recognized the defendant from prior arrests and knew that his driver's license had been revoked).

Defendant also challenges Detective Sharp's reliance on the database information establishing that his license was suspended. Here, Defendant claims that a suspended driver's license can be remedied and asserts that Detective Sharply improperly assumed the information from the previous day was accurate. The Sixth Circuit has established that "where the criminal activity is of an ongoing nature, it will take longer for the information to become stale" and that driving on a suspended license constitutes a continuing offense. *United States v. Sandridge*, 385 F.3d 1032, 1036 (6th Cir. 2004).

The Court does not find that the information establishing that Defendant's driver's license was suspended was stale, largely due to the fact that Detective Sharp checked the applicable databases and confirmed that Defendant's driver's license was suspended the day before the traffic stop. *Cf. United States v. Greene*, No. 1:12-CR-129-14, 2014 WL 1745648, at *4 (E.D. Tenn. May 1, 2014) (finding the reasonable suspicion for a traffic stop—that defendant was driving on a

16

suspended license—stale, as "there has been a 160–day interval between Officer Payne's knowledge of the status of Mr. Greene's driver's license until he was stopped on that basis"); *United States v. Bunton*, No. 2:09-CR-106, 2010 WL 2082642, at *4 (E.D. Tenn. May 24, 2010) ("While there is no bright line rule as to the length of time that must pass before information becomes stale, in the present case it had been at least three years, if not longer, since Sergeant Dunn had received any information about the status of the defendant's drivers license.").

In *Sandridge*, the Sixth Circuit found that the license status information was not stale where "[w]hen Officer Grubb observed Sandridge driving on March 27, 2002, he reasonably suspected that he was driving without a valid license because, just three weeks earlier, on March 5, 2002, Grubb ran a license check on Sandridge's car and learned that he did not have a valid license." 385 F.3d at 1036. Significantly, as discussed by the Sixth Circuit in *Sandridge*, Defendant fails to point to and "there are no facts in the record suggesting that [Detective Sharp] should have assumed that [Defendant's] ongoing offense had ceased" since he learned that Defendant's driver's license was suspended. *Id.* Accordingly, the Court finds that Detective Sharp had a reasonable basis for suspecting that Defendant was operating a motor vehicle with a suspended license, that this information was not stale, and therefore he properly attempted to effectuate a traffic stop.[3]

---

[3] The Court notes that Defendant does not challenge the scope or duration of the traffic stop and that Defendant subsequently fled the scene of the traffic stop while holding a firearm.

## V. CONCLUSION

After carefully considering the parties' arguments and the relevant legal authorities, the undersigned respectfully **RECOMMENDS** that Defendant Badgett's Motion to Suppress Evidence and Statements [**Doc. 23**] be **DENIED**.[4]

Respectfully submitted,

*/s/ Bruce Guyton*
United States Magistrate Judge

---

[4] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).